## LACKAWANNA FOUNDRY CO. v. GOODMAN.

Circuit Court of Appeals, Third Circuit.
February 24, 1928.

No. 3613.

1. Bankruptcy ⬅99—Order that petition be dismissed on performance of conditions which were not performed held not effective to terminate the proceeding.

Order of court that a petition in bankruptcy be dismissed and the receiver discharged on performance of two conditions, neither of which was performed, held, ineffective to terminate the proceeding.

2. Assignments ⬅57—Assignee held estopped to assert claims by permitting debtors to settle with assignor without giving notice of assignment.

An assignee of choses in action, who, though present with counsel, permitted the debtors to make an agreement of compromise and settlement with her assignor of all matters between them, including the claims assigned, without giving notice of the assignment, held, precluded from asserting rights thereunder.

Appeal from the District Court of the United States for the Middle District of Pennsylvania; Johnson, Judge.

In the matter of Lackawanna Foundry Company, bankrupt. Appeal by bankrupt from an order allowing the claim of Blanche Friedman Goodman. Reversed.

Myer Kabatchnick, D. J. Reedy, and R. L. Levy, all of Scranton, Pa., for appellant.

Philip V. Mattes, Lee P. Stark, and J. Julius Levy, all of Scranton, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The District Court sustained exceptions to a master's report dismissing the claim of Blanche Friedman Goodman against the Lackawanna Foundry Company, then a bankrupt, and directed the clerk to "enter judgment" in her favor and against the company for the full amount of her claim. The company appealed.

The case grew out of a controversy between father, daughter, father-in-law, son-

in-law, brother-in-law, and the Lackawanna Foundry Company, a corporation, intensified by marital difficulties and business transactions between relatives. While we have considered the case in its manifold aspects, we shall discuss—and then very briefly—only those that bear directly on our decision.

The first group of questions—as stated by the appellant—concerns (a) the jurisdiction of the court of bankruptcy to try out a proceeding in bankruptcy after the bankruptcy petition has been dismissed; and (b) the jurisdiction of the District Court to try an action of assumpsit, not instituted or pleaded otherwise than by filing a claim against the bankrupt estate, and to enter a general judgment in the District Court against the debtor.

[1] If the trial court did things that validly raise the questions as stated, then certainly the first and fundamental inquiry is that of jurisdiction of the trial court and it is a question that, aside from appropriate assignments of error, this court is bound to ask and answer for itself. C., B. & Q. R. Co. v. Willard, 220 U. S. 413, 31 S. Ct. 460, 55 L. Ed. 521. In doing this we first turn to the record and there find that the foundry company was in bankruptcy, yet it was still going on, and that the fact of bankruptcy was hurting its business. Every one agreed that the bankruptcy proceeding should be dismissed and the receiver discharged but Blanche Friedman Goodman had a claim of $8,000 against the estate to which she held fast. To get rid of bankruptcy and yet protect Blanche, the court entered an order by which, the appellant says, it dismissed the petition and discharged the receiver and then acted as though the bankruptcy proceedings were still pending and finally entered the judgment complained of. The order is as follows:

"It is hereby ordered. and decreed that the involuntary petition filed to the above number in bankruptcy be dismissed and the receiver heretofore appointed be discharged upon the said alleged bankrupt giving Blanche Friedman Goodman, one of the claimants and petitioners therein good and sufficient security in the sum of $8,000 to be approved by the court. * * *"

It then referred Blanche's claim to a master to take testimony and report his findings.

On first reading, the order seemingly dismissed the bankruptcy petition and discharged the receiver, but on second reading we do not find that to be its import. It was in terms an order of dismissal and discharge effective not presently but in the future and on the performance of two conditions; namely, that the bankrupt give good and sufficient security in a named sum to protect Blanche's claim and that the security be approved by the court. Such security was not given and therefore it was not approved and, in consequence, the two conditions precedent to the dismissal were not performed. The master, however, continued with the reference and disallowed the claim, which, on exceptions, the court allowed in the form of an order for "judgment" against the company in her favor. If it is a general judgment entered in the District Court on a hearing by the trial judge, without a jury, of a demand in assumpsit not pressed by suit or sustained by pleadings but arising as a provable claim in bankruptcy, the District Court was of course without jurisdiction. If, on the other hand, though mistakenly called a judgment, it is in truth not a judgment of the District Court but an allowance by the court of bankruptcy of a provable claim in bankruptcy made in the bankruptcy proceeding (which we have just found was still pending), and, in consequence, is not a lien upon the bankrupt's property but is collectible only from the bankrupt's estate, then we think the order, though oddly phrased, is to be read in connection with the court's previous order and is, if otherwise sustainable, valid. We find it is the latter. This conclusion drives us to the highly confused facts which we shall briefly and in the interest of clarity state not in precise chronological order but rather in reverse order.

[2] Samuel M. Friedman is the father of Blanche Friedman Goodman. She was the wife of Arnold Goodman. Adolph Goodman is a brother of Arnold. The Goodmans were the operators and principal owners of the stock of the Lackawanna Foundry Company. Friedman held a substantial bloc of its shares as collateral, and controlled shares standing in the names of four members of his family. Being inclined to help his son-in-law, Friedman loaned money to the company and endorsed its paper. Rather promptly his daughter and her husband fell out. Being heavily committed to an undertaking in which he no longer had a personal interest and with the money he had loaned not being repaid and the notes bearing his endorsement and discounted by the banks approaching maturity, the parties became engaged in a bitter controversy. Eventually, all the parties with their attorneys met at a lawyer's office to compose their differences. Without repeating all that transpired, it will be enough to say that, after heated discus-

sion, the three men entered into two instruments of writing which together comprise one undertaking. The main difficulty at this conference arose out of the fact that Friedman had advanced $4,000 to the company in money and was an accommodation endorser on $14,000 of the company's notes, discounted by the bank and rapidly approaching maturity. Certain shares of the company's stock had been transferred to him and a lot of stoves as collateral security for his money advances and note obligations. By the agreement of settlement he surrendered the shares of stock and also the warehouse certificates for the stoves and agreed to pay two of the company's notes of $2,000 each when they should mature, and the Goodmans agreed to pay $10,000 of its notes on maturity, all endorsed by Friedman. The Goodmans also agreed to pay, and later did pay, Friedman a cash balance of $633.55. The agreement is silent in respect to Friedman's money advances to the company. On the face of the transaction, as it appeared to all save Friedman, he got the short end of the settlement.

This agreement, made and signed by the three men, was drawn in language as clear and broad as capable lawyers could put it. The clause providing for mutual releases reads as follows: "This settlement agreement is in full settlement, compromise and discharge of each of the parties as to any claim of the other arising out of the affairs of the said Lackawanna Foundry Company and any and all transactions between the parties relating to the affairs of the said company, and all agreements of any kind heretofore made between the parties regarding the said company are hereby abrogated and made null and of no further effect," and (by a supplemental agreement in which the foundry company joined) "that the settlement therein contemplated shall bind and inure to the benefit of the Lackawanna Foundry Company and the said company and the said Samuel M. Friedman hereby agree that such settlement is final and conclusive between them in full compromise and discharge of each of them as to any claim of the other arising out of any act of either of them prior to the date hereof."

That, seemingly, closed matters of every kind between Friedman, the two Goodmans and the foundry company.

But—and here is the trouble in the case—on August 15, 1924, five days before the agreement of compromise was entered into, Friedman "bargained, sold, assigned and transferred" to his daughter, Blanche Friedman Goodman, the claimant in this bankruptcy proceeding, "all that debt or sum of eight thousand ($8,000.00) and 00/100 dollars which is now due and owing to me from the Lackawanna Foundry Company * * * for money loaned and received from me by said Lackawanna Foundry Company * * * in the following amounts: May 17, 1924, one thousand ($1000.00) dollars – Check. May 20, 1924, two thousand ($2000.00) dollars – Cash. May 26, 1924, two thousand ($2000.00) dollars – Cash. May 27, 1924, one thousand ($1000.00) dollars – Check. June 20, 1924, fifteen hundred ($1500) dollars – Check. June 17, 1924, five hundred ($500.00) dollars – Check."

The difficulty with this assignment is that while the first, fourth, fifth and sixth items represent money which Friedman had loaned the company, aggregating $4,000, the second and third items, aggregating $4,000 and called "cash," do not represent money advanced by him to the company in cash or in any other form but refer to notes of the company bearing those dates on which he was accommodation endorser. These notes were for three months, had been discounted, and had not matured. When he composed his differences with the Goodmans and the company on August 20, 1924, embracing these same obligations, Friedman was silent as to the attempt he had made five days before to assign them to his daughter, though, of course, when he joined in the settlement he knew what he had done. It is clear from the contract of se' 'lement that Friedman had sustained and had accepted a loss for the money he had advanced the company, amounting to $4,000, and that he had undertaken to pay two notes for $2,000 each (named in the second and third items of the assignment previously made) in return for being paid a certain sum of money and being relieved of his endorsement liability on the remaining $10,000 of the company's notes. Yet he knew all the time that if his assignment to his daughter stood, he would, instead of getting the worst of the bargain of settlement, come out whole. Friedman now says that this is precisely what was intended by all the parties. It is unfortunate that it was not so expressed in the contract of settlement. The fact remains that he entered into an agreement of compromise and settlement in respect to some of the very things with which he had previously parted or had attempted to part by assignment to his daughter. If this were a controversy between Friedman and the Goodmans or between him and the company, there would be nothing to

talk about. But it is a matter between Blanche and the bankrupt estate and, manifestly, Friedman's conduct did not affect her if she was ignorant of the situation, and for the moment we shall assume she was.

What was her situation? First, we decide adversely to the foundry company the questions of the execution of the assignment and sufficiency of proof by copy before the master. Next, holding the assignment, what did the instrument "bargain, sell, assign and transfer" to Blanche? Certainly not $2,000 cash advanced the company on May 20, and $2,000 cash advanced it on May 24, as the writing indicates, for Friedman advanced no cash on those days. As we have pointed out, those two items stand not for cash but for company notes endorsed by Friedman and then held by a bank, being the same notes which by the agreement of settlement he later engaged to pay. On those notes there was no obligation of the foundry company to Friedman except a contingent obligation to pay them. He had not loaned the company his money; he had loaned the company his credit, and if it had paid the notes it would never have owed him anything on them. Clearly there was nothing here for Friedman to assign. He could not sell and assign to his daughter his undertaking to pay the notes of another or assign to her an obligation of the other until on maturity it had defaulted in payment. Nor was it an assignment of a chose in action. It was an assignment of nothing that was assignable and therefore, in our opinion, the court fell into error in including this $4,000 in its $8,000 award.

The remaining $4,000 represented money which Friedman had advanced the company on the dates and in the amounts indicated in the assignment and which, by the releasing clause in the contract of settlement later entered into, he had given up. The only way in which Blanche can get this money from the foundry company is by proof that she or Friedman had notified the company or Goodman of the assignment before the company entered into the contract of settlement. Friedman testified that he told one of the Goodmans of the assignment on August 16. Goodman contradicted his statement with accompanying proof that he was absent in New Jersey on that day. On the issue between Friedman and Goodman as to notice of the assignment we hold against Friedman. This places on Blanche the burden of proving that she notified the company or one of the Goodmans of the assignment. She maintains that she notified the company at the conference in the lawyer's office on August 20, before the company executed the contract of settlement. If she did, that was enough; but we are constrained to hold that she did not do so. Certain it is she was there with her attorney, that she spoke of a claim of $8,000 which she held against the company, and that she spoke about it repeatedly, and loudly enough for all present to hear, but nowhere do we find in the record that, either formally or informally, did she notify the company that these six several matters, concerning which the parties were then dealing, had been assigned to her. In other words, while she certainly spoke out about her claim of $8,000, she did it in a way that no one present, according to the testimony of various witnesses, interested and disinterested, understood that her claim was based on an assignment of the very matters then under discussion which she had obtained from her father five days before. In order to assert a valid claim against the foundry company on the assignment, it became necessary under Pennsylvania law (and this is a Pennsylvania transaction) for Blanche to give the debtor notice of the assignment so that it should not be hurt in dealing, innocently and ignorantly, with the assigned items in the then pending compromise settlement. Aside from convincing testimony that Blanche gave the company no such notice, it is difficult to believe that if the company had been informed of the assignment it would have gone on and treated the items as not assigned and concluded the agreement of compromise in the form it did.

We are forced to find on the record as it stands that Blanche Friedman Goodman, though she repeatedly asserted a claim against the foundry company, did not indicate its character and therefore did not give the requisite legal notice of the assignment.

It follows that the decree below must be reversed.